IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Criminal No. 11-37 |
| | ) | See Civ. Nos. 15-1339 & 15-1340 |
| KARLA S. PODLUCKY and | ) | |
| G. JESSE PODLUCKY, | ) | |
| | ) | |
| Defendant/Petitioners. | ) | |

## MEMORANDUM OPINION

Petitioners Karla S. Podlucky ("Karla") and G. Jesse Podlucky ("Jesse"), on October 15, 2015, filed a pro se Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 and affidavit in support thereof (Doc. Nos. 299-310). The Government filed its initial response on February 4, 2016 (Doc. No. 318), to which Petitioners replied on March 15, 2016 (Doc. No. 319). On August 30, 2016, Petitioners filed a Motion for Expansion of the Record and for an Evidentiary Hearing, as well as briefs in support thereof (Doc. Nos. 324-27). The Government responded to these motions on September 21, 2016 (Doc. No. 329), and Petitioners replied on October 25, 2016 (Doc. No. 330). Upon consideration of these filings, the Court denies Petitioners' motions pursuant to Section 2255, and denies as moot their motions for expansion of the record and for an evidentiary hearing, for the reasons set forth below.

## I.     Background

The parties are very familiar with the facts in this matter, so the Court will not set forth any lengthy factual summary. Suffice to say that this case involved money laundering in connection with fraud associated with a beverage company known as LeNature's, Inc. Co-defendant Gregory J. Podlucky ("Greg") was the one-time majority shareholder and chief

executive officer of LeNature's, and the key figure in fraud allegations brought against officers, employees, and clients of LeNature's. Greg is the wife of Karla, and Jesse is their son. Jesse was also employed by LeNature's from 2003 through 2006 as a bookkeeper. Beginning in 1998, Greg implemented an elaborate scheme to defraud investors and lenders by falsely inflating LeNature's sales and revenue figures so as to obtain capital.[1] Money stolen by Greg as part of this scheme was used to make a number of non-business-related purchases, including roughly $33 million worth of rare and valuable jewels. The fraud was detected after LeNature's was forced into bankruptcy in 2006. Around that time and continuing after, Greg and Petitioners proceeded to attempt to liquidate and conceal certain assets obtained pursuant to the fraudulent scheme, particularly the jewelry. This was done through a complicated series of sales, transfers, and gifts, filtered through various legal entities created by the Podluckys.

On or about February 8, 2011, a grand jury returned a five-count indictment against Greg, Karla, and Jesse. Count One charged the defendants with conspiracy to commit money laundering from October 26, 2006 through December 31, 2010, by selling jewelry purchased unlawfully with funds stolen from LeNature's and completing transactions distributing the proceeds to various separate legal entities so as to conceal and disguise the nature, location, source, ownership, and control of the jewelry, in violation of 18 U.S.C. § 1956(h). Counts Two and Four charged the defendants with engaging in specific financial transactions which involved the proceeds of specified unlawful activity, knowing that the property involved represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole or in part to conceal and disguise the location, source, ownership and control of the proceeds, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2. Specifically, Count Two involved

---

[1]     Greg was charged at Criminal No. 09-279 in connection with the underlying fraud at LeNature's and at Criminal No. 09-278 with income tax evasion. Karla and Jesse were not charged in connection with either of these cases or with the underlying fraud in general.

the deposit of a check for $100,000.00 drawn by Jesse from the account of Twilight Trust, into the account of the attorney representing Greg in the related criminal matters involving the fraud at LeNature's at Criminal Nos. 09-278 and 09-279. Count Four involved the deposit of a check for $100,000.00 drawn by Karla from the account of Green Special Advisors at Ameritrade into the account of the same attorney. Counts Three and Five charged the defendants with knowingly engaging in specific financial transactions in criminally derived property with a value greater than $10,000.00, in violation of 18 U.S.C. §§ 1957(a) and 2. Specifically, Count Three involved the use of a Discover Card for the purchase of patio furniture in the amount of $11,336.70. Count Five involved the withdrawal of $80,021.79 to purchase 11 cashiers checks to be distributed to various payees.

On June 20, 2011, after unsuccessfully attempting to convince the Court to suppress evidence seized from the Podluckys' home, co-defendant Greg pled guilty to Count One of the indictment at Criminal No. 11-37, charging him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), as well as Count Three of the indictment at Criminal No. 09-278, charging him with income tax evasion, in violation of 26 U.S.C. § 7201, and Count Twenty-four of the superseding indictment at Criminal No. 09-279, charging him with mail fraud, in violation of 18 U.S.C. § 1341. In addition, he acknowledged his responsibility for the substantive offenses alleged at Counts Two through Five in this case, and for a number of counts at Criminal Nos. 09-278 and 09-279. Pursuant to the plea agreement entered into between Greg and the Government, Greg would be subject to a term of imprisonment of not more than 20 years, a term of supervised release of 5 years, no fine, a special assessment of $300, and restitution as determined by the Court. On October 20, 2011, the Court sentenced Greg to 60 months' imprisonment at Criminal No. 09-278, 240 months' imprisonment at Criminal No. 09-

279, and 240 months' imprisonment at Criminal No. 11-37, all to be served concurrently, and to be followed by 3 years' supervised release at Criminal No. 09-278, 5 years' supervised release at Criminal No. 09-279, and 3 years' supervised release at Criminal No. 11-37, all to be served concurrently. The Court further ordered restitution at Criminal No. 09-279 in the amount of $661,324,329.81.

On November 29, 2011, after a lengthy jury trial, Petitioner Jesse was found guilty on all five counts of the indictment in this case, and Petitioner Karla was found guilty at Counts Three, Four, and Five. On May 21, 2012, the Court entered judgment as to Karla and Jesse: Karla was sentenced to a term of imprisonment of 51 months to be followed by three years' supervised release at each of Counts Three, Four, and Five, to be served concurrently, and Jesse was sentenced to a term of imprisonment of 108 months to be followed by three years' supervised release at each of Counts One through Five, to be served concurrently. Each forfeited all rights to a Charles Schwab account totaling $1,372,966.04, and an *in personam* judgment in the amount of $1,443,894.78 was entered against each. Petitioners subsequently appealed and challenged their convictions and sentences, raising a number of claims, including that the evidence adduced at trial was insufficient to establish their guilt. On May 27, 2014, the Third Circuit Court of Appeals affirmed the Petitioners' convictions and sentences.

On October 15, 2015, Petitioners, acting pro se, each filed a motion pursuant to 28 U.S.C. § 2255.[2] That same day, in accordance with United States v. Miller, 197 F.3d 644 (3d Cir. 1999), the Court issued an Order advising Petitioners that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prohibits consideration of a second or successive habeas

---

[2]    Petitioners actually jointly filed a single motion and supporting affidavit, which was then properly filed separately for each of them by the Clerk of Court for this District. Therefore, the motion and affidavit pending for Karla and the ones pending for Jesse are identical.

petition absent certification from the Third Circuit that certain very specific and rare circumstances exist. With that in mind, Petitioners were ordered to advise the Court as to how they wished to proceed, and specifically, whether they wished to have their motions ruled upon as filed and lose the ability to file successive petitions absent Third Circuit certification, or whether they wished to withdraw the motions and file all-inclusive Section 2255 petitions within the one-year statutory period of the AEDPA. Petitioners responded on November 9, 2015, indicating that they wished to proceed under their motions as filed. As noted above, several additional documents were subsequently filed in connection with these motions.[3]

## II.    Discussion

Pro se pleadings are held to less stringent standards than formal pleadings drafted by lawyers. See Haines v. Kerner, 404 U.S. 519, 520 (1972); Holley v. Department of Veterans Affairs, 165 F.3d 244, 247 (3d Cir. 1999). However, even a pro se plaintiff must be able to prove a "'set of facts in support of his claim which would entitle him to relief.'" Haines, 404 U.S. at 520-21 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Petitioners bring their pro se motions pursuant to Section 2255. This statute permits a "prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . [to] move the court which imposed the sentence to vacate, set aside

---

[3]    The Court also notes that, shortly after the final filing in this case, Greg began filing dozens of requests for relief in this case and in his other two criminal cases. The Court regrets that this, in addition to the sheer volume of the materials filed in connection with the present motions, have contributed to delay the issuance of the Court's written opinion. The Court reviewed the materials when first filed to ensure that there was no basis for vacating Petitioners' conviction or sentence, and, indeed, the Court determined that there was no merit to Petitioners' claims. However, especially in light of the obvious amount of time and work that went into preparing the present motions, the Court wanted to give the voluminous material a very thorough review before issuing its opinion, which unfortunately took a great deal of time, particularly in light of Greg's extensive filings during this same time period.

or correct the sentence." 28 U.S.C. § 2255(a). An evidentiary hearing is not required on a Section 2255 motion if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).

Petitioners raise five grounds upon which they believe relief should be granted: (1) violation of their First Amendment right to freedom of religion; (2) violation of their Sixth Amendment right to effective assistance of trial counsel; (3) violation of their Sixth Amendment right to effective assistance of appellate counsel; (4) violation of their Fifth Amendment right to due process with regard to government misconduct, prosecutorial misconduct, and malicious prosecution; and (5) actual innocence and miscarriage of justice. (Petitioners' Motions to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. Nos. 299 at 10 and 305 at 10)).[4] However, although only two of these grounds expressly say so, Petitioners assert that each of the five grounds is "rooted" in ineffective assistance of counsel. (Pet. Mtn. at 5). This distinction is important because substantive claims regarding issues like Petitioners' First Amendment rights or prosecutorial misconduct would be procedurally defaulted to the extent that Petitioners failed to raise these issues on direct appeal unless they can demonstrate (1) both cause and actual prejudice, or (2) that they are actually innocent. See Bousley v. United States, 523 U.S. 614, 622 (1998); United States v. Essig, 10 F.3d 968, 979 (3d Cir. 1993) (superseded by rule on other grounds as recognized in United States v. Turner, 677 F.3d 570, 578 (3d Cir. 2012)).

---

[4] Because, as noted, Karla and Jesse actually filed one joint Section 2255 motion and affidavit, citations to their identical motions will simply be to "Petitioners' 2255 Motion" or "Pet. Mtn." Likewise, the accompanying affidavit with attached exhibits, filed as Doc. Nos. 300-04 for Karla and 306-10 for Jesse (but, again, identical to one another), will be referred to as "Petitioners' Affidavit" or "Pet. Aff."

Although Petitioners explain that they did not bring their claims of ineffective assistance of counsel on direct appeal because such issues are more properly raised collaterally, they have offered no objective evidence as to why they did not raise the substantive claims regarding their First Amendment rights or regarding prosecutorial misconduct.[5]  Moreover, although they do argue that they are actually innocent, as discussed below, the Court finds no merit to this claim. Accordingly, the Court cannot consider Petitioners' substantive claims on the merits.  The Court will however consider any claims that appear to be substantive in nature as part of Petitioners' claims of ineffective assistance of counsel.  Regardless, for the reasons that follow, the Court finds no merit in Petitioners' claims and finds that the record conclusively shows that they are not entitled to relief under Section 2255 on any of the grounds that they allege.

### A.      Ineffective Assistance of Counsel

A defendant seeking relief under Section 2255 on the ground of ineffective assistance of counsel "must show both that: (1) counsel's representation fell below an objective standard of 'reasonableness under prevailing professional norms;' and (2) the defendant suffered prejudice as a result – that is, there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different."  Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996) (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

---

[5]      Arguably, Petitioners' claim that appellate counsel was ineffective could be construed as an attempt to explain why these issues were not raised on appeal.  However, such an attempt, at best, would be vague and lacking in sufficient detail to determine whether sufficient cause exists. Regardless, as to both the First Amendment issue and the issue of prosecutorial misconduct, the Court has, in its analysis herein, considered and found no merit to Petitioners' underlying substantive claims, so, in any event, there is no prejudice to Petitioners.  See United States v. Noble, No. 06-10, 2013 WL 3392443, at *13 n.1 (W.D. Pa. July 8, 2013).

> In reviewing counsel's performance, [a court] must be highly deferential. [A court] must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. Moreover, [a court] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Sistrunk, 96 F.3d at 670 (citing Strickland, 466 U.S. at 689-90) (internal quotation marks and citations omitted). "'It is [] only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance.'" United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) (quoting United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989)).

### 1.     First Amendment Claims

One of the five specific issues raised by Petitioners relates to their First Amendment right to freedom of religion. As discussed above, Petitioners cannot raise a substantive claim that these rights were violated, as such an argument has been procedurally defaulted. They can and do argue, though, that their First Amendment rights were violated by and through trial counsel's incompetency. They assert that their trial attorneys were ineffective in failing to present evidence of the religious basis for their submissive response to Greg's leadership of the household and in failing to screen potential jurors for religious bias during voir dire. They also contend that their religious beliefs should have been presented "to show motive for their actions and how such beliefs shielded them from either learning or believing [Greg's] alleged criminal activity." (Pet. Aff. at 1). The Court, however, finds that trial counsel's handling of these issues was within an objective standard of reasonableness under prevailing professional norms.

First, counsel for both Karla and Jesse did, in fact, submit proposed voir dire questions that would have examined the potential jurors' religious bias. (Doc. Nos. 138, 140). The Court,

however, refused to allow such questions, finding Petitioners' religious beliefs to be irrelevant to the proceedings and indicating that it would not allow such evidence. (Joint Appellate Appendix ("Appx.") at 2-3). It was not the actions of counsel, therefore, but a decision by this Court, that kept such questions out of voir dire. Since, as explained, Petitioners cannot challenge the underlying Court decision, but rather only their attorneys' conduct, there is no basis for relief on this aspect of Petitioners' argument. As for evidence of religiously based submissiveness, Karla did testify regarding her religious beliefs at some length (*e.g.*, Appx. at 1442-43, 1468, 1537, 1618); in fact, she began testifying that as a Christian woman she was supposed to believe her husband, but an objection by the Government, in light of the Court's previous finding that Petitioners' religious beliefs were not relevant, forced Karla's counsel to move on in his questioning. (Appx. at 1618). Again, therefore, it was the Court, and not counsel, that prevented any further evidence as to submissiveness from being admitted.[6]

Regardless, even if Petitioners could collaterally challenge this Court's evidentiary findings, the type of evidence they allege should have been offered is simply inadmissible in this case. As noted above, Petitioners would seek to introduce evidence as to their religiously-based submissiveness so as to shed light on their motive for their knowledge and actions. Generally speaking, religious beliefs cannot be used to establish motive. See United States v. Epstein, 91 F. Supp. 3d 573, 593 (D.N.J. 2015). While not directly on point, the court in Epstein explained the difference between evidence of religious beliefs offered to show what one knew or intended, which may be admissible, and evidence offered to show why one had such knowledge or intent, which generally is not. In other words, religious beliefs may be admissible if the knowledge or

_____

[6]     Contrary to Petitioners' claims in their Reply Brief, the Court at no point was under the impression that Petitioners were seeking to introduce evidence of their religious beliefs to serve as a complete defense to the alleged crimes. (Doc. No. 319 at 29). The Court had a proper understanding of the purpose for the proffered evidence.

intent at issue was actually derived from those beliefs, but not where religious beliefs motivated the actions or intentions of the defendant. The court in Epstein discussed, as an example of the first category, the case in United States v. Hsia, 24 F. Supp. 2d 33 (D.D.C. 1998), where evidence of religious beliefs was admissible to show the defendant's understanding of how property was held and owned by a Buddhist Temple and the monks and nuns working there. The court in Epstein distinguished that specific instance of religious beliefs informing knowledge as to a relevant issue from the situation in its own case, where the defendants' religious beliefs would, at best, only establish the defendants' motivations. See 91 F. Supp. 2d at 592-93.

The evidence at issue here – as in Epstein – clearly falls in the second category. What was really at issue here was Petitioners' knowledge, primarily regarding the source of funds used to purchase the jewelry involved in the money laundering. Both Karla and Jesse claimed to lack such knowledge because they did not question the instructions they received from Greg. It is whether or not they, in fact, had such knowledge, and not the reason why they did or did not possess it, that is relevant. It made no real difference whether Petitioners proffered good, bad, or no reasons for their ignorance – the issue was simply what they actually knew.[7] The jury apparently found that they possessed the requisite *mens rea* based on the totality of the evidence.

In any event, whatever marginal relevance evidence of religiously-based submissive motivation may have had would have been substantially outweighed by its potential prejudicial impact. Accordingly, such evidence would have been inadmissible pursuant to Federal Rule of Evidence 403. See United States v. Stimler, 864 F.3d 253, 269 (3d Cir. 2017). Indeed, this

---

[7]     Evidence of the theological validity of Petitioners' beliefs would not have been relevant in any event. Accordingly, there would be no basis for admitting into evidence the scripture verses cited by Petitioners or for presenting the Rev. Dan Dumas as an expert witness. (Pet. Aff. at 84). Likewise, there would be no basis for admitting the lengthy rebuttal to the Rev. Marla Erling – a person completely unassociated with this case who apparently offered her opinion as to Petitioners' beliefs in the media well after the trial – that Petitioners set forth in their Reply Brief.

Court would have certainly disallowed such evidence under Rule 403 even if it had found the evidence to have any relevance. As noted, the Court did, in fact, find such evidence to be inadmissible in this case.

Therefore, in sum, it was the Court, and not trial counsel, that prevented Petitioners from presenting any more evidence regarding their religious beliefs as to familial submissiveness, and therefore counsel was not ineffective in this regard. Moreover, the Court's decision was solidly based in law, and there is no indication as to what counsel could have or should have done to persuade the Court to find differently. Petitioners are not entitled to relief on this ground.

**2.      Other Trial Counsel Issues**

In addition to the specific issue regarding the First Amendment, Petitioners allege that their respective trial attorneys were ineffective in numerous other ways. The Court will not address each item of alleged ineffectiveness separately, but will discuss the matter of trial counsel's effectiveness generally and focus on a few of the more prominent issues raised by Petitioners. In the end, the Court concludes that trial counsel performed well within an objective standard of reasonableness under prevailing professional norms.

Petitioners' arguments regarding trial counsel's alleged ineffectiveness revolve largely around claims that the attorneys did not present enough evidence and/or witnesses. Petitioners identify a substantial number of additional exhibits and an enormous number of additional witnesses that they allege would have supported their defense. Indeed, the affidavit in support of Petitioners' motion is 109 single-spaced pages, their reply brief is 51 single-spaced pages, and they submitted thousands of pages of exhibits they deem to be relevant, covering everything from estate-planning documents to photographs establishing the Podlucky children's bona fides as Washington Capitals fans. The Government suggests that Petitioners incorrectly focus on the

volume of potential evidence, rather than on the relevance and materiality of that evidence (Doc. No. 318 at 37), and Petitioners themselves assert that the sheer volume of the exhibits presented is "proof-positive" of trial counsel's ineffectiveness. (Pet. Aff. at 70). The Court emphasizes at the outset that counsel was not ineffective for simply not adding more and more evidence to an already large case record. Indeed, as set forth below, the Court finds that trial counsel was not ineffective at all.

Aside from a few fundamental decisions that are reserved to the client – such as what plea to enter, whether to waive the right to a jury trial, whether the client will testify, whether to appeal, and whether to waive the right to counsel – "an attorney's duty is to take professional responsibility for the conduct of the case, after consulting with the client." Jones v. Barnes, 463 U.S.745, 753 n.6 (1983). See also Government of Virgin Islands v. Weatherwax, 77 F.3d 1425, 1433 (3d Cir. 1996). Therefore, if a decision falls within the realm of "strategic decisions" to be made by the attorney, a reviewing court may find whatever decisions that attorney made to be sufficiently ineffective, "only if he either failed completely to consult with his client, or if the decision was itself inept or incapable of interpretation as sound." United States v. Narducci, 18 F. Supp. 2d 481, 493 (E.D. Pa. 1997). Which witnesses to call and what exhibits to offer are clearly within this realm. See Diggs v. Owens, 833 F.2d 439, 446 (3d Cir. 1987). Petitioners here do not allege that they were precluded from making any of the fundamental decisions which they were entitled to make.[8] What is at issue, then, are the strategic decisions made by counsel as to how best to present Petitioners' case.

There is no allegation that counsel failed completely to consult with Karla and Jesse regarding evidentiary issues. To the contrary, Exhibits U and PP to Petitioners' Affidavit

---

[8] The Court notes that Petitioners each pled guilty, demanded a jury trial, testified on their own behalf, and appealed.

suggest that there was actually a great deal of communication regarding strategic trial and sentencing issues. (Pet. Aff., Exs. U, PP). Accordingly, to establish ineffective assistance of counsel, Petitioners must show that their attorneys' strategic choices not to call any of the dozens of witnesses or to offer any of the hundreds of exhibits suggested by Petitioners were inept or objectively unsound. They simply cannot make such a showing.

Virtually all of the evidence Petitioners allege their attorneys should have offered is nothing more than additional evidence in general support of some point already raised by the defense at the trial. There is no "smoking gun" type of evidence that would exonerate Petitioners or that would have any real probative value as to their knowledge as it relates to the money laundering activity. Rather, Petitioners, as discussed above, simply assume that more evidence of the same point is better. Not surprisingly, then, much of what Petitioners propose is redundant to the evidence already in the record, and counsel certainly had no duty to submit cumulative or redundant evidence. See Danner v. Cameron, 564 Fed. Appx. 681, 685 (3d Cir. 2014); Gaines v. D'ilio, No. 15-761, 2019 WL 851592, at *10 (D.N.J. Feb. 22, 2019). Further, Petitioners simply assume that whatever potential evidence they set forth would have been admissible and permitted by the Court. Petitioners make little, if any, attempt to authenticate the enormous amount of evidence they believe counsel should have offered. They do not address whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. They ignore the fact that some of what they allege counsel should have submitted postdates the trial. Some of what they offer is not actually evidence, but rather their own lengthy explanation and/or interpretation of the evidence, and it is unclear how this would have been admissible at trial.

Moreover, in determining whether Petitioners have been prejudiced by counsel's strategic decision not to offer this evidence, the Court must consider ***all*** aspects of the proffered evidence, including aspects both beneficial to Petitioners' case and those detrimental to it. See Huffington v. Nuth, 140 F.3d 572, 578 (4th Cir. 1998). Petitioners frequently claim that certain witnesses should have been called without considering that these witnesses may not have said exactly what Petitioners wanted them to say. As discussed below, some of the witnesses Petitioners argue should have been called, especially Greg, could have been extremely detrimental to Petitioners' case. They do not address the concern that presenting an even more elaborate and convoluted explanation may have been very counter-productive in a money laundering case where it was alleged that they engaged in elaborate and convoluted mechanisms to move and conceal assets. In other words, they seemingly argue that counsel was ineffective for not putting forward every piece of evidence potentially available. As explained herein, that is simply not sufficient.

An important theme in Petitioners' filings is that Greg should have been called to testify at their trial. They frequently cite areas in which they believe Greg's testimony would have been helpful to them had he been called as a witness. However, Greg's shadow loomed large over this entire case; much of the evidence at trial pertained to his conduct, both in connection with the underlying fraud and with the money laundering. He was repeatedly portrayed, both by the Government and by Petitioners themselves, as the true villain in this entire matter. (See, e.g., Appx. at 1850-51, 1871-1874, 1892-96). His dishonesty and domineering behavior were points raised over and over by the Government and by Petitioners.[9] It is difficult to see how the strategic decision not to make this person's testimony a centerpiece of the defense could not be interpreted as sound. Regardless, even if the very large risk of calling Greg as a witness was one

---

[9]     And, for that matter, by Robert Lynn at his trial involving the LeNature's fraud at Criminal No. 09-279.

counsel should have been willing to take, nothing he would have offered would have justified taking such a risk.

One issue as to which Petitioners contend that Greg should have been called to discuss was the matter regarding the change in the Podlucky family's address. An issue raised at Karla and Jesse's trial, and in regard to Karla's sentencing, was the fact that Karla had her and her family's home address changed in December of 2010 and January of 2011 from 345 Cobblestone Lane to 297 Sunrise Lane. The Government contended that this change of address occurred when Petitioners knew the address was a matter significant to the investigation. Petitioners generally, and Karla specifically, have consistently claimed that the change of address was done openly and for legitimate reasons. Petitioners now allege that if only more evidence regarding the address change, including Greg's testimony, had been offered into evidence, the jury would not have drawn an inference that the address change was done for nefarious reasons. There is simply no merit to this argument.

First, the Court notes that Karla did, in fact, testify at some length to the issue, offering her explanation for the reasons behind the address change toward the end of 2010. (Appx. at 1532-36). Physical evidence of the layout of the lots constituting the Podluckys' property was submitted in the form of Bing maps (Ex. GJP D-2) and photographs of the mailboxes for and near the Podluckys' residence (Ex. GJP E1 and 2). (Appx. at 1606, 1636-38; Doc. No. 159 at 18-19). Petitioners were given a full opportunity to present their position regarding the change of address, and they took advantage of this opportunity. Petitioners fail to show how additional evidence raising the same basic points would have made any difference.

As to Greg's potential testimony regarding the issue, he offered such testimony at his own pretrial conference on May 31, 2011, relying on the change of address in an attempt to

suppress evidence seized by the Government pursuant to a warrant to search 345 Cobblestone Lane, arguing that the warrant was for a different piece of property altogether. (Pet. Aff., Ex. KK at 195-216). To suggest that his attempts at testifying regarding the address change went poorly would be an understatement. Greg was a particularly unconvincing witness, and the Court denied his suppression motion. Greg, in fact, decided to enter into a plea agreement shortly thereafter. However, even if he had performed very well on the stand, his testimony was substantially similar to what Karla testified to at her trial. As discussed above, having the information come from Greg, the central figure in the fraud, would not have made it any more believable. At the very least, counsel's decision not to call Greg to address this issue again on the stand was not one incapable of being interpreted as sound.

Regardless, Petitioners seem to fundamentally misperceive the nature of the Government's argument regarding the address change. By and large, the additional evidence that Petitioners claim their counsel should have offered would have been to establish which street and/or mailing address applied to which property lot, *i.e.*, whether 297 Sunrise Lane was the "correct" address in regard to the Podluckys' home during the relevant time period. However, in his closing argument, Government counsel expressly asserted that the question was not "what the correct address was," but rather, "why change it?". (Appx. at 1864). Government counsel went on to argue that it was not the change of address, but rather the timing that was relevant, arguing that the change was done to create a "cloudy picture" in an attempt to thwart the Government's investigation. (Appx. at 1914-16).

The Government, therefore, submitted the evidence not to show that the Podluckys were using the wrong address when they changed it to 297 Sunrise Lane, but that they used the

different addresses to create confusion so as to support the money laundering scheme.[10]

Evidence that would merely establish which lot should have been assigned which street address –

*i.e.*, most of the evidence Petitioners assert that counsel should have offered – is marginally

relevant to this issue at best. The same is true for evidence regarding the reasons for the

confusion, such as the Robert Kimball and Associates survey that Petitioners claim was

defective. Indeed, such evidence would do nothing to explain situations such as where the

Podluckys used **both** the Cobblestone Lane and Sunrise Lane addresses on the **same** document.

Petitioners submit that counsel was ineffective for failing to present evidence that would show

just that. For instance, the Schwab One Trust Account Application contained in Exhibit S

demonstrates that the Podluckys used the Sunrise Lane address for the Twilight Palm Canyon

Asset Management Trust, but continued to use the Cobblestone Lane address for their own

address on the same form. Likewise, Exhibit FF contains an Ameritrade Account Application

where Green Special Advisors LLC is given the Sunrise Lane address, while Karla and Jesse

indicate that their personal address is Cobblestone Lane. (Pet. Aff., Exs. S at 4-8, FF at 37-41).

Such evidence would only further demonstrate the "cloudy picture" the Government accused

Petitioners of trying to paint, as it would further support an inference that Petitioners routinely

changed the address they would use in a given situation to create a trail that was harder to follow.

In short, the additional evidence, both in the form of testimony and as physical evidence,

that Petitioners insist their attorneys should have offered at trial was of little if any relevance,

largely cumulative, and likely far more harmful to Petitioners' case than helpful. Indeed, by

suggesting approximately 20 witnesses that should have been called and a vast number of

exhibits that should have been offered, Petitioners are essentially alleging that counsel should

---

[10]     The Court again emphasizes that Greg did, in fact, attempt to take advantage of the address confusion to have evidence suppressed, so this is far from an unfounded theory.

have spent nearly half of the trial addressing this issue. Under these circumstances, it can hardly be said that counsel's strategic decision to offer a more limited and focused range of evidence on this subject was unreasonable.

Karla and Jesse similarly argue that their attorneys should have called Greg to testify as to the issue of the $5 million stock re-purchase option that was raised at Petitioners' trial. Both Karla and Jesse, at some point, indicated that they believed that the jewels sold as part of the money-laundering scheme had been purchased with funds from a $5 million stock re-purchase option redeemed by Greg. Indeed, both presented testimony regarding their belief that this stock option was the source of the funds used to purchase the jewels legitimately. (Appx. at 1420, 1425, 1484, 1619, 1666, 1718-19, 1722-23). They argue, though, that counsel was ineffective for not introducing more evidence regarding the stock option, including, as noted, Greg's testimony. Again, the evidence Petitioners suggest should have been offered is of little to no relevance and cumulative of other evidence.

As noted, Petitioners suggest that Greg should have been called to testify as to the stock re-purchase option and what he had communicated to Karla and Jesse regarding this option. However, Greg would have simply been restating what Petitioners themselves said on the stand. Further, as with the address change issue, Greg was a uniquely toxic witness, and it would have been very risky to call him simply to reiterate what Karla and Jesse had already said. This is particularly true given the fact that the jewels, of course, were not actually purchased with funds from any redeemed stock option, so he, in essence, would have had to testify that he was lying to his family, and Petitioners themselves do not claim he was willing to do that.[11]

---

[11] The same would be true in regard to having Greg testify about investment strategy or estate planning in general.

Moreover, Greg's testimony would not explain the later "confusion" as to the source of the jewels sold as part of the money laundering. It is not disputed that some of the jewels – specifically a diamond ring and a pair of diamond earrings – were later sold to Karla's parents, who then gifted them to a trust controlled by Jesse and his brothers (only to have their purchase money returned through various sources). Indeed, Greg, Karla, Jesse, and Karla's parents were present at a meeting where this was discussed. (Appx. at 1676). It is also not disputed that a false historical record of this diamond jewelry was created – essentially claiming them to be family heirlooms – in preparation for the sale of the jewelry at Sotheby's Auction House. Jesse himself testified that he participated in the preparation of the document. (Appx. at 1692-93). Greg's testimony as to what he told his family in regard to the $5 million stock option would not explain any of that. In fact, some of the evidence Petitioners argue their attorneys should have presented would have only further established Jesse's knowledge that the origin of the jewelry had been falsified. (Pet. Aff., Ex. T at 21-22, 44, 55-59).

In addition, much of Petitioners' proposed evidence would have gone toward the existence and legitimacy of the alleged stock option – not toward Petitioners' knowledge. Again, the jewels were not actually purchased with funds associated with this alleged redemption of this supposed stock re-purchase option, so it would not have mattered whether the option existed or not. What mattered was what Karla and Jesse knew and believed about this stock option, and about the source of funds for the jewels generally, and, as discussed, they were permitted to and did testify to this point. The Court cannot find counsel unreasonable or inept for deciding not to present a large volume of evidence regarding a stock option that, if it existed at all, was not the source of the funds at issue.

Another area in which Petitioners allege their attorneys were ineffective was in agreeing to the admission of a November 9, 2007 stipulation in the civil forfeiture action at Civil No. 07-1296, whereby Greg and Karla waived their right to contest the forfeiture of certain gems, jewelry, and precious metal seized from LeNature's. (Appx. at 143-44). Petitioners argue that letting this stipulation into evidence was tantamount to agreeing to a directed verdict, and that counsel should have kept this evidence out or, at the very least, made it clear that neither Karla nor Jesse actually read or signed any such waiver. Unfortunately for Petitioners' argument, counsel did both of these things.

Prior to trial, Karla's counsel filed a Motion In Limine seeking to prohibit the Government from introducing this stipulation into evidence, as well as evidence of the civil forfeiture at Civil No. 07-1296 in general. (Doc. No. 82). The Court, however, denied this motion, finding the stipulation to be relevant and not overly prejudicial if offered for the limited purpose of determining whether Karla knew that these items were the proceeds of unlawful activity. (Appx. at 1337). Accordingly, counsel sought, and received, a limiting instruction from the Court indicating that the stipulation could be considered for only that purpose as to Karla and that it must not be considered as an admission of wrongdoing. The Court further instructed the jury that it was not to consider the evidence at all as to Jesse. (Appx. at 1788-89). It is not clear what else counsel could have done in light of the Court's findings.

Moreover, both defense attorneys elicited testimony helpful to their clients as to this issue. Jesse's counsel, on cross examination, elicited testimony from Government witness Thomas Czerski that Jesse had not participated in or consented to the civil forfeiture. (Appx. at 1384). Karla's counsel asked her about the issue during her testimony, allowing her to explain her understanding of the stipulation and to emphasize that she had not signed it. (Appx. at 1491-

92). All in all, the Court finds the defense attorneys' handling of this matter to have been well within an acceptable professional range.

Petitioners allege that their attorneys were ineffective in failing to present evidence regarding various other fairly minor points raised at trial, but there is no merit to any of these claims. Jesse, for instance, continues to insist that a video of a LeNature's facility supposedly being built in Arizona should have been presented to bolster his testimony that LeNature's was a thriving company at the time the jewels were purchased, and that, apparently, it was not unreasonable to believe that the jewels were purchased legitimately with funds obtained through the repurchase of Podlucky stock. However, Jesse's counsel did try, repeatedly, to offer this video into evidence, but the Court refused to admit it. Jesse argues that his counsel should have done a better job arguing the relevance of the evidence to the Court, but the matter was actually discussed at great length, and the Court itself reviewed the video in making its decision. (Appx. at 1651-60, 1763-65). The Third Circuit affirmed the Court's ruling on appeal, see United States v. Podlucky, 567 Fed. Appx.139, 148-49 (3d Cir. 2014), and Petitioners cannot relitigate an issue such as this raised and considered on direct appeal. See United States v. DeRewal, 10 F.3d 100, 105 n.4 (3d Cir. 1993).

Likewise, Karla argues that counsel should have offered into evidence advice she received from Robert Williams, the family attorney, regarding placing the gems in a protective trust. Mr. Williams, of course, was deceased at the time, but Karla argues that the evidence could have been brought in by other means. The problem is that her attorney did seek to elicit testimony regarding Mr. Williams advice through Karla herself. (Appx. 1483-84, 1488, 1509-22). Karla further suggests that her attorney should have tried to introduce the evidence through another source, to avoid hearsay issues. However, the Court ultimately concluded that Mr.

Williams' advice was irrelevant, not that it was hearsay (Appx. at 1522), so an attempt to bring in this evidence through another witness would have had no more success.

Jesse asserts that his counsel performed unreasonably by not more vigorously countering testimony from Sotheby's employees, particularly Angela Hudson and Catharine Becket, that he had not been introduced to them during an August 10, 2009 meeting involving the proposed auction of the diamond jewelry. (Appx. at 932, 939-40, 972). He seems to believe that Ms. Hudson and Ms. Becket were incorrect and that this issue should have received more focus at trial. However, the Court notes that counsel did elicit testimony from Jesse indicating that he believed that they had been introduced and that he did not attempt to conceal his identity. (Appx. at 1690). It is not clear why additional evidence would have been warranted on such a minor point. Regardless, the evidence Jesse believes should have been offered to support his testimony includes several comments by Ms. Hudson and Ms. Becket that would only further support an inference that Jesse *was* obfuscating his identity at the August 10, 2009 meeting, referring to him as the "mystery man" and describing the lack of a formal introduction as unusual. (Pet. Aff., Ex. T at 8, 12; Ex. KK at 249, 253).[12] Counsel cannot be found to have been inept in making the strategic decision to avoid presenting this type of evidence, as it is very reasonable to conclude that the evidence would have been more damaging to Petitioners than helpful.

---

[12] It actually appears from Exhibits T and KK that Ms. Hudson and Ms. Becket believed Jesse to be a security guard or courier during that first meeting. It also appears that, while they may have heard Jesse's name at some point during the meeting, neither remembered being introduced to him.

Accordingly, Petitioners cannot establish that counsel's strategic evidentiary decisions were incapable of interpretation as sound or that they were otherwise ineffective.[13] Regardless, even if they had pointed to some evidence that counsel should have introduced, they have failed to show that they were prejudiced by any such failure to do so. Even if counsel performed below an objective standard of reasonableness – which, as discussed, they did not – Petitioners still would have to establish that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different, meaning a probability sufficient to undermine confidence in the outcome. See Strickland, 466 U.S. at 694. They have not and cannot do so here.

Petitioners do not, for example, address the substantial evidence admitted against them at trial,[14] evidence that the Third Circuit found sufficient to support their convictions. See Podlucky, 567 Fed. Appx. at 145-48. Moreover, Petitioners at various points seem to simply assume that evidence, particularly witness testimony, would have been helpful to their cause. As the Court discussed above, this is not necessarily the case, and the Court must consider both the potential harmful as well as the potential helpful aspects of the proffered testimony. See Huffington, 140 F.3d at 578. Indeed, throughout its analysis of the reasonableness of counsel's strategic decisions, the Court noted that certain evidence was as likely to or more likely to harm Petitioners' case than to help it. This is particularly true in regard to the witness on whom Petitioners would most rely – Greg.

---

[13]     As the Court stated at the outset, it will not address every evidentiary issue raised by Petitioners individually. Instead, the Court has attempted to utilize Petitioners' most prominent arguments to demonstrate an overall lack of ineffectiveness on the part of their trial attorneys. The evidence set forth by Petitioners that the Court has not explicitly addressed is actually less relevant, making it even more reasonable that counsel made the strategic choice not to offer it.

[14]     The Court must consider the overall strength of the evidence in deciding whether a petitioner has been prejudiced. See Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999).

As to the many other witnesses listed by Petitioners, they fail to establish what those witnesses' testimony would actually be and how it would help them. To establish prejudice under Strickland, Petitioners cannot rely on mere speculation as to what these various witnesses would have said, but rather must demonstrate what that actual testimony would be. See Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006). Exhibit KK to Petitioners' Affidavit names dozens of witnesses that counsel should have called at trial. However, Petitioners do little more than set forth prior testimony or statements from these potential witnesses and then state the additional questions they would ask. They do not address the possibility that some of these witnesses might be unwilling to testify, or that their testimony would not be what Petitioners assume it would be.[15] They do not discuss the risk of potentially calling hostile or unwilling witnesses, or the effect unexpected testimony could have had on the case. They certainly do not consider the issue of whether, or at what point, the testimony would be merely cumulative of other record evidence. Moreover, a good number of the people named in Exhibit KK would appear to have little if any personal knowledge of Petitioners' involvement in the alleged money laundering.

In the end, Petitioners' argument that trial counsel was constitutionally ineffective boils down to their belief that not only would presenting more evidence as to virtually any contested point, no matter how minor, be preferable, but that the decision not to do so is incapable of being interpreted as reasonable trial strategy. As the Court has discussed at length, this simply is not the case, and Petitioners cannot establish that their trial counsel failed them.

### 3. Appellate Counsel Issues

Petitioners contend not only that their trial counsel was constitutionally ineffective, but that their appellate counsel was also. The Strickland test applies to a defendant's claim that his

---

[15] For example, one of the witnesses they argue should have been called, Mark Coulson, was clearly vetted by defense counsel but indicated that he had nothing to say. (Pet. Aff., Ex. U at 8).

appellate counsel was ineffective, just as it does as to trial counsel.  See United States v. Cross, 308 F.3d 308, 315 (3d Cir. 2002).  This means, to establish ineffectiveness, Petitioners must prove that: (1) appellate counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) they suffered prejudice as a result. Petitioners attempt to meet these criteria by arguing that counsel failed to raise certain issues on appeal, and that they mishandled the ones they did.  The Court disagrees and finds that Petitioners' appellate attorneys were not ineffective.

While the decision whether or not to appeal belongs to the criminal defendant, determining which issues to argue on appeal is the province of counsel.  Indeed, "[o]ne element of effective appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise."  Buehl, 166 F.3d at 174.  Likewise, counsel cannot be found to be ineffective for failing to bring meritless claims.  Moore v. Mitchell, 708 F.3d 760, 776 (6th Cir. 2013); Werts v. Vaughn, 228 F.3d 178, 202 (3d Cir. 2000); United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999).  Here, most of the issues that Petitioners seem to argue should have been raised on appeal are really just their rebuttal to various Government theories.  Indeed, Petitioners seem to fundamentally misunderstand the appellate process.  Appellate counsel does not simply argue against a defendant's guilt generally; they must raise specific appealable issues. For the most part, Petitioners do not identify what those appealable issues were, but, instead, simply provide arguments that they seem to believe discredit the Government's case generally.

For example, Petitioners contend that appellate counsel was ineffective in failing to challenge the admissibility of the stipulation to consent in the civil forfeiture action.  However, Petitioners do not address the Court's decision to admit the evidence for only a limited purpose, nor do they discuss the rules and laws applicable to evidence generally.  While they attempt to

explain the significance of the fact that neither signed the stipulation, they fail to acknowledge that the record already demonstrated this fact. (Appx. at 1384, 1491-92). In short, they do not set forth the legal basis for the argument as to this issue that they believe should have been raised by appellate counsel, and they cannot establish that counsel was ineffective.

Likewise, Petitioners argue that appellate counsel was ineffective in the way they argued certain issues that admittedly were raised before the Third Circuit, such as the admissibility of the video of the LeNature's plant allegedly being established in Arizona that this Court found to be inadmissible. However, counsel cannot be found to be ineffective merely because he or she was unsuccessful. See Zettlemoyer v. Fulcomer, 923 F.2d 284, 296 (3d Cir. 1991). Generally, claims that counsel should have argued a point more vigorously will not suffice to establish ineffectiveness. See Hicks v. DiGugliemo, No. 09-4255, 2013 WL 4663266, at *7 (E.D. Pa. Aug. 29, 2013). Here Petitioners offer no analysis as to what counsel failed to do to prevail on this issue, much less that the failure to do so was objectively unreasonable. Therefore, Petitioners cannot establish that their appellate counsel was ineffective.

## B.      Prosecutorial Misconduct

Petitioners allege not only poor representation from their own attorneys, but also misconduct of the Government's attorneys. As the Court noted above, Petitioners did not raise any such issue on direct appeal, nor have they offered any objective evidence as to why they did not do so. Generally speaking, then, they would be procedurally defaulted from raising the substantive issue of prosecutorial misconduct. See Oelsner v. United States, 60 Fed. Appx. 412, 417-18 (3d Cir. 2003). However, failure to object to such misconduct can constitute ineffective assistance of counsel. See Alexander v. Shannon, 163 Fed. Appx. 167, 173 (3d Cir. 2006). Because the issues of whether Government misconduct infringed on Petitioners' rights and

whether counsel adequately combatted such misconduct are so intertwined, the Court will simply

discuss the merits of the underlying issue of whether Government counsel did engage in

misconduct. In any event, the Court finds that they did not.

Under Section 2255, relief for prosecutorial misconduct is appropriate when the

prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction

a denial of due process." United States v. Mangiardi, 173 F. Supp. 2d 292, 303 (M.D. Pa. 2001)

(quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). See also United States v. Bates, 46

Fed. Appx. 104, 110 (3d Cir. 2002). "For due process to have been offended, the prosecutorial

misconduct must be of sufficient significance to result in the denial of the defendant's right to a

fair trial." Mangiardi, 173 F. Supp. 2d at 303 (quoting Wertz, 228 F.3d at 197-98).

Unfortunately for Petitioners, the record does not provide any support for a claim of

prosecutorial misconduct.

As the Government points out in its response, much of what Petitioners label as

prosecutorial misconduct is nothing more than the Government having presented evidence with

which Petitioners disagree. Prosecutorial misconduct can occur where the government attorneys

manipulate or misstate the evidence, see United States v. Stillis, No. 04-680-03, 2015 WL

233010, at *6 (E.D. Pa. May 14, 2015) (citing Darden, 477 U.S. at 181-82), but that is not what

happened here. The Government certainly offered different interpretations of the trial evidence,

and invited the jury to reach different inferences, but they did not manipulate or misstate the

evidence itself. Indeed, a prosecutor "is afforded considerable leeway in fashioning a

summation," and the Government "is entitled to summarize its case graphically and forcefully."

Bates, 46 Fed. Appx. at 110. Moreover, even if Petitioners had established that any witnesses

had presented false testimony, which they have not, they have not established that the

Government knew or should have known of the perjury or that any prejudice resulted.  See

Prosdocimo v. Secretary, Pa. Dep't of Corrections, 458 Fed. Appx. 141, 146-47 (3d Cir. 2012).[16]

Little need be said in regard to Petitioners' claims regarding Assistant United States

Attorney Donovan Cocas' and United States Probation Officer Angelica Banta's supposed

"history" of misconduct.  Petitioners do nothing more than demonstrate that each, at some point

in their significant careers, took positions with which the appellate court ultimately disagreed.

There is nothing improper about this in any way.  Accordingly, Petitioners cannot show that

there was Government misconduct in this case, and they therefore cannot demonstrate that their

own attorneys were ineffective for letting this happen.

## C.    **Actual Innocence**

Finally, Petitioners argue that they are actually innocent of the crimes for which they

were convicted, and that their trial resulted in a miscarriage of justice.  They base this claim on

the cumulative errors that they identify elsewhere in their Affidavit and argue that the evidence

they have presented shows the sheer impossibility of their guilt.  (Pet. Aff. at 11-12).  The Court

disagrees and finds that Petitioners have not and cannot establish their actual innocence.

In the context of a collateral attack on a conviction, a claim of "actual innocence" means

a claim that one is truly factually innocent of the crime charged, not just that the conviction was

legally insufficient in some way.  See Bousley, 523 U.S. at 623.  The standard is a stringent one

---

[16]    Over the course of a month-long trial, it is almost certain that someone misstated some fact at some time.  However, the primary disagreement over the material facts such as the address change, the stock re-purchase option, and the civil forfeiture stipulation was over the meaning and import of this evidence, not its accuracy.  The Government did not, for instance, claim that Jesse had signed the stipulation, or that Karla made statements admitting that she knew that the stock re-purchase option was not valid.  What the Government did was suggest that the jury could draw inferences from certain facts that were different than those that Petitioners apparently drew.  Likewise, Petitioners do not suggest that the address change never happened or that the stipulation did not exist – they present alternative explanations for these facts.  Any minor misstatement during the trial did not materially change this situation.

– Petitioners must establish that, in light of all of the evidence "it is more likely than not that no reasonable juror would have convicted [them.]" <u>Dixon v. Warden FCI Schuykill</u>, No. 15-cv-210, 2015 WL 8279785, at *4 (M.D. Pa. Sept. 11, 2015) (citing <u>Schlup v. Delo</u>, 513 U.S. 298, 327-28 (1995)). Petitioners do not meet this standard. As discussed, the Court has found no merit in Petitioners' numerous other claims, and certainly does not find any cumulative error. Moreover, Petitioners' claims seem to be premised on their belief that the evidence they have produced conclusively disproves the Government's entire theory of guilt. No matter how sincerely they may believe this, reasonable jurors could certainly disagree with them. Petitioners present their interpretation and explanation of the facts, but those are not the only reasonable inferences one could draw. The jury saw this case differently than Petitioners did, and there is no reason to think that they would not have done the same even if presented with all of the evidence Petitioners set forth in support of their motions.

### D.    Motions for Expansion of the Record and Evidentiary Hearing

As the Court stated at the beginning of this opinion, it denies as moot Petitioners' motions to expand the record and for an evidentiary hearing. As to their request to expand the record, the Court notes that it did, in fact, consider all of the evidence contained in and attached to Petitioners' motion in determining the issues discussed herein. For the reasons discussed, nothing in Exhibits MM through QQ would alter the Court's analysis. In regard to Petitioners' request for an evidentiary hearing, one thing that is not lacking in this case is evidence. The full trial record and appellate record, and the numerous proposed exhibits submitted by Petitioners, conclusively show that Petitioners are entitled to no relief. <u>See</u> 28 U.S.C. § 2255(b). The Court needs no more information in making this determination.

**III.     Conclusion**

For the above-stated reasons, Petitioners' motions pursuant to Section 2255 are denied in their entirety.  Further, this Court will not issue a certificate of appealability in this case.  A certificate of appealability may issue under Section 2255 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth herein, Petitioners have not made a substantial showing of the denial of a constitutional right, and a certificate of appealability should not issue in this action.


s/ Alan N. Bloch
United States District Judge



Date:     March 26, 2019

ecf:      Counsel of record

cc:       G. Jesse Podlucky, Reg. No. 32737-068
          FPC Yankton
          P.O. Box 700
          Yankton, SD 57078